Copies to: **Judge**
**AUSA - Special Proceedings** IN THE UNITED STATES DISTRICT COURT
**Dft.**                  FOR THE DISTRICT OF COLUMBIA

**FILED**

KEVIN DUANE BERTRAM,        )  Case No. 1:15-cr-00012-ABJ
            Petitioner,     )  PETITIONER'S REPLY TO THE          **JUL 1 3 2016**
        v.                  )  GOVERNMENT'S RESPONSE TO
UNITED STATES OF AMERICA,   )  PLAINTIFF'S MOTION TO          Clerk, U.S. District and
            Respondent.     )  VACATE, SET ASIDE, OR CORRECT A Bankruptcy Courts
_____)  SENTENCE UNDER 28 U.S.C. § 2255

## RELIEF REQUESTED

Because the Government erroneously states that two of Petitioner's allegations -- including an allegation of actual innocence that can never be procedurally barred in any fashion -- are procedurally barred by Petitioner's waiver in his plea agreement, and because the Government fails to address or deny -- and therefore admits under Federal Rule of Civil Procedure 8(b)(6) and concedes the merits of -- Petitioner's conflict of interest allegation, Petitioner respectfully requests that this Honorable Court order an evidentiary hearing to establish the remaining merits and the appropriate relief.

## STANDARD FOR EVIDENTIARY HEARING

Section 2255 provides that an evidentiary hearing shall be granted "unless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." United States v. Weaver, 234 F.3d 42, 46 (D.C. Cir. 2000)(quoting 28 U.S.C. § 2255).



## MATERIAL FACTS EXPRESSLY CONCEDED BY THE GOVERNMENT
## AND MATERIAL FACTS CONCEDED BY THE GOVERNMENT'S SILENCE

**Importantly, the Government concedes the merits of Petitioner's Conflict of Interest allegation — as detailed below — by failing to address or deny the allegation in its Response brief.**

The Government **expressly** concedes the following:

(1) Petitioner employed Paychex -- a payroll service company -- to withhold federal taxes and FICA taxes the wages of Distributive Networks. [D.E. 26, p. 2].

(2) Petitioner's ordered restitution is $30,000 less than the alleged tax loss charged in the information. Id., p. 7.

(3) Petitioner contested his guilt as early as his sentencing, and the Court recognized it as a disagreement of his guilt but said Petitioner had already had his chance to assert his innocence previously and go to trial. Id., p. 7.

The Government additionally concedes the following facts by failing to address them or deny them:

(1) Paychex fulfilled their entire contractual obligation to perform tasks for Distributive Networks such as filing W2s, printing payroll checks, and performing all other payroll duties from 2005 through 2007. [D.E. 24, pp. 13-14].

(2) Paychex also satisfactorily performed all of these services for Petitioner's other company -- Tusk Mobile, LLC -- through July 2010. Id., p. 26.

(3) Paychex continued to perform every service for which they were contracted for Distributive Networks through July 2010 minus one -- the filing of Form 941 -- which they stopped sometime in 2007. Id., p. 26.

(4) Paychex never notified Petitioner that it stopped filing Form 941 for Distributive Networks. Id., p. 14.

(5) Petitioner only first became aware that Paychex had stopped filing Form 941 for Distributive Networks when IRS Criminal Investigators came to his home unannounced and informed him. Id., pp. 14, 26.

(6) Felonies under Title 26 U.S.C. § 7702 -- like this one -- are infrequently prosecuted. Id., p. 14.

(7) There are numerous similarly situated (but Democrat) individuals who were not prosecuted -- including one such individual who was invited to the Attorney General Loretta Lynch's nomination announcement. Id., pp. 17-18.

(8) Petitioner did not engage in any of the conduct that usually leads to

2

prosecution of this felony. Id., pp. 17–18.

(9) ONLY GOP new media consulting firms were prosecuted in the greater Washington, DC area for violations of 26 U.S.C. § 7202 from 2010 through 2015. Id., p. 19.

(10) Using the calculations most favorable to the Government, there was a one in 350,000,000 (1 in 350 million) chance that the only two prosecutions under 26 U.S.C. § 7202 in the greater Washington, DC area would be prosecuted at all. Id., p. 19.

(11) The most realistic calculation shows that there was a one in 5,000,000,000 (1 in 5 billion) chance that the only two prosecutions under 26 U.S.C. § 7202 in the greater Washington, DC area would be prosecuted at all. Id., p. 19.

(12) Treasury Inspector General for Tax Administration has opened a criminal investigation of former Special Agent and now IRS consultant Mary C. Balberchak (Case No. #54-1506-0019-C) as a direct result of her conduct in Petitioner's case. Id., p. 20.

(13) As soon as Petitioner became aware that Paychex had not filed Form 941, he immediately retained as counsel Margaret Kavalaris. Id., pp. 23, 28.

(14) At no time did Counsel Kavalaris express that the failure to pay over federal payroll taxes was anything more than a civil matter and certainly not a criminal matter. Id., 29.

(15) In 2009, Petitioner retained Caroline Ciraolo — now the Acting Assistant Attorney General for the Department of Justice Tax Division (head of the DOJ Tax Division) — as counsel. Id., pp. 23, 29.

(16) Counsel Ciraolo advised Petitioner not to pay the owed federal payroll taxes but directed him instead to pay the delinquent Maryland State payroll taxes. Id., pp. 23, 29.

(17) IRS auditor Frederick Robinson told Petitioner that he should wait to pay the delinquent payroll taxes. Id., pp. 22–23, 29–30.

(18) Petitioner retained the firm Dickstein Shapiro -- including Lawrence Garr -- in 2009. Id., p. 27.

(19) Later, Petitioner received a letter from the IRS addressed to "Kevin BertMAN" (Petitioner's name is "Kevin BertRAM") and mailed originally to an address Petitioner had not used in over five (5) years. Id., p. 27.

(20) Counsel Garr advised Petitioner not to take any action on the notice from the IRS. Id., p. 27.

(21) Counsel Garr specifically advised Petitioner that he should wait to be contacted by the IRS. Id., p. 30.

(22) Petitioner would have declined the plea agreement if he had had the benefit of these witnesses -- witnesses that Counsel Namorato failed to investigate. Id., p. 23-24.

(23) While Counsel Namorato was representing Petitioner, he was being vetted for nomination to be the Assistant Attorney General of the Department of Justice Tax Division. Id., p. 24.

(24) Counsel Namorato never informed Petitioner of this conflict. Id., p. 24.

(25) Counsel Namorato's representation decreased significantly in 2013. Id., p. 24.

## MATERIAL DISPUTED FACTS FROM OUTSIDE THE RECORD

Petitioner disputes the following facts listed in the Government's responsive pleading:

(1) Although the Government claims that Petitioner's actual innocence claim is an attempt to withdraw his guilty plea, Petitioner has made no such request or argument. [D.E. 26, p. 8].

(2) The Government inadvertently miscites Bousely v. United States, 523 U.S. 614, 621 (1998) on page 8 of its responsive pleading. The quote it provides is not found anywhere in Bousely but in Tollett v. Henderson, 411 U.S. 258

(1973).  Id., p. 8.

(3)  The Government repeatedly refers to Cono Namorato as Petitioner's "prior counsel" and claims that he was not Petitioner's counsel throughout the plea agreement stage.  This is materially false.  Cono Namorato was retained on May 30, 2012 (see Exhibit 1 – Letter of Engagement) and represented Petitioner until June 8, 2015 (see Exhibit 2 – Letter of Termination) and was even involved in conversations with Jessie Liu and Thomas Perrelli about the Sentencing Memorandum.  Id., pp. 10–12.

## ARGUMENT

### GOVERNMENT CONCEDES MERITS OF PETITIONER'S CONFLICT OF INTEREST ALLEGATION

Federal Rule of Civil Procedure 8(b)(6) provides:

**Effect of Failing to Deny.**  An allegation — other than one relating to the amount of damages — is admitted if a responsive pleading is [1] required and [2] the allegation is not denied.

The Court ordered the Government to respond to Petitioner's initial habeas petition on May 11, 2016.  [D.E. 25].  Thus, the Government's responsive pleading was required.

Notably, not only does Petitioner's Memorandum make clear that it raises **TWO** allegations of ineffective assistance of counsel — see [D.E. 24, p. 14]("Petitioner's Ground Two includes two arguments of counsel's ineffectiveness"), but the Government's responsive pleading also recognizes that Petitioner raised two separate allegations of ineffective assistance of counsel.  See [D.E. 26, p. 10]("In his ineffective assistance of counsel claim, [Petitioner] accuses ... Mr. Cono Namorato (of the law firm Caplin and Drysdale) of 'failing to investigate' certain matters along with 'representing petitioner in spite of an undisclosed conflict of interest.'")(internal citations omitted).  Clearly, the Government had notice of and was aware that Petitioner raised two separate arguments of ineffective assistance of counsel.

The Government, however, failed to address or deny Petitioner's conflict of interest allegation. As per Fed.R.Civ.P. 8(b)(6), all the facts of the allegation are admitted by the Respondent. At minimum, an evidentiary hearing is warranted to establish the appropriate relief in the face of this conceded allegation.

<u>GOVERNMENT'S RELIANCE ON PLEA WAIVER AS ABSOLUTE BAR<br>IS UNCONSCIONABLE AND WROUGHT WITH LEGAL ERROR</u>

The Government raises only one argument against two of Petitioner's allegations (selective prosecution and actual innocence): the allegations are barred by the waiver in the plea agreement. The Government is wrong.

First, the Supreme Court and the United States Court of Appeals for the District of Columbia have long held that when a petitioner raises an allegation that he or she is actually innocent of the conduct for which he or she stands convicted, <u>no procedural bar</u> may be upheld, and the allegation of actual innocence <u>must</u> be reviewed on the merits. See <u>United States v. Baxter</u>, 761 F.3d 17, 26 (D.C. Cir. 2014)("In <u>Bousely [v. United States</u>, 523 U.S. 614, 622 (1988)], the [Supreme] Court explained that, '[w]here a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either [1] 'cause' and actual 'prejudice,' ... or [2] that he is 'actually innocent.' <u>Id.</u>' at 622 (citations omitted); see also <u>McQuiggin v. Perkins</u>, 133 S.Ct. 1924, 1931–32, 185 L.Ed.2d 1019 (2013).").

Petitioner raised an allegation of actual innocence, and the Government's contention that the allegation can be procedurally barred flies in the face of decades of established court precedent.

The Supreme Court went a step further in <u>McQuiggin</u> when it held "that actual innocence, if proved, serves as a <u>gateway</u> through which a petitioner may pass whether the impediment is a procedural bar, as it was in <u>Schlup [v.</u>

Delo, 513 U.S. 298 (1995)] and House [v. Bell, 547 U.S. 518 (2006)], or ...

expiration of the statute of limitations." McQuiggin, 133 S.Ct. at 1928

(emphasis added).  In those cases, as in this case, "a convincing showing of

actual innocence enable[s] habeas petitioners to overcome a procedural bar to

consideration of the merits of their constitutional claims."  Id.  Petitioner

makes such a showing — as explained in his initial petition and below — and

his other claim of selective prosecution is a constitutional issue.  Thus,

neither of these arguments is barred by Petitioner's waiver in his plea

agreement.  See United States v. Wilson, 15 F.Supp. 3d 126 (D.D.C. Feb. 19,

2014)("A court may consider a claim that is procedurally barred ... if the

defendant can show that the error 'has probably resulted in the conviction of

one who is actually innocent.'")(quoting Bousely, 523 U.S., at 623 and Murray

v. Carrier, 477 U.S. 478, 496 (1986)).

As Petitioner explained in his initial petition, there are two elements

required by Title 26, United States Code, Section 7202, and the Government

bears the burden to prove both of the elements to sustain a conviction:

> [(1)] Any person required under this title to collect, account for, and
> pay over any tax imposed by this title [(i.e. a "responsible person"),
> and (2)] who willfully fails to collect or truthfully account for and
> pay over such tax.

Petitioner provided substantial evidence and precedent in his initial

petition to show that his actions were not willful (i.e. he relied on advice

from credible sources such as the head of the DOJ Tax Division, an IRS

auditor, and other credible attorneys when he did not pay the taxes at that

time), but the Government did not address or respond to any of the merits in

the allegation whatsoever.  None of the facts or precedent Petitioner

provided in his petition that support Petitioner's lack of willfulness are

contested, meaning — at the very least — that the Government concedes that

it cannot meet its burden to prove the second requirement of Section 7202,

the very reason it has chosen not to raise any argument alleging that it can.

It is of note that "the Supreme Court held that under tax laws, unlike other laws, to prove willfulness the government has the burden of negating a defendant's claim of ignorance of the law or a claim that because of a misunderstanding of the law, he had a good-faith belief that he was not violating any provision of the tax laws." United States v. Easterday, No. CR05-00150CRB, 2007 U.S. Dist. LEXIS 53175 (N.D. Ca. July 12, 2007)(quoting Cheek v. United States, 498 U.S. 192, 201-202 (1991)).

As the Petitioner adequately shows in his initial petition -- which the Government declines to dispute -- Petitioner had every reason to believe an IRS auditor's advice, several counsels' advice, and the advice from the Acting Assistant Attorney of the DOJ Tax Division that he could wait to pay the owed payroll taxes. Petitioner's good-faith belief that he should wait until the IRS assessed him was reasonable.

But even if his belief were unreasonable, that would not be enough to find that Petitioner acted willfully. "This is so because one cannot be aware that the law imposes a duty upon him and yet be ignorant of it, misunderstand the law, or believe that the duty does not exist. In the end, the issue is whether, based on all the evidence, the Government has proved that the defendant was aware of the duty at issue, which cannot be true if the jury credits a good-faith misunderstanding and belief submission, whether or not the claimed belief or misunderstanding is objectively reasonable." Easterday (quoting Cheek, at 202).

The sole evidence the Government relies on in its responsive pleading to assert Petitioner's guilt are the statements elicited in his guilty plea and his subsequent plea colloquy. [D.E. 24, pp. 2-7].

As recognized by civil rights attorney and author Harvey Silverglate in his well-known book Three Felonies a Day:

> Astute observers of the federal criminal justice system have long since given up believing that the guilty plea reveals true culpability. It's all too common for such pleas to be the product of risk avoidance at the

expense of truth.  In this sense, the scripted plea colloquy has become a big part of corruption afflicting the entire system.

Three Felonies a Day, pp. XVIII–XIX. (Exhibit 3).

The Georgetown Law Journal Annual Review of Criminal Procedure (2015) further recognizes that it`is a myth that:

> "[g]uilty pleas are conclusive proof of guilt.  Many people, including judges, take comfort in knowing that an overwhelming number of criminal cases are resolved by guilty plea rather than trial.  Whatever imperfections there may be in the trial and criminal charging process, they believe, are washed away by the fact that the defendant ultimately consents to a conviction.  But this fails to take into account ... the creativity of prosecutors in hatching up criminal cases where no crime exists and the overcriminalization of virtually every aspect of American life.  It also ignores that many defendants cannot, as a practical matter, tell their side of the story at trial because they fear being impeached with prior convictions or other misconduct.  And, of course, if the trial process is perceived as highly uncertain, or even stacked in favor of the prosecution, the incentive to plead guilty to some charge that will allow the defendant to salvage a portion of his life, becomes immense.  If the prosecution offers a take-it-or-leave-it plea bargain before disclosing exculpatory evidence, the defendant may cave to the pressure, throwing away a good chance of acquittal.

The esteemed Honorable Alex Kozinski, 44 Geo. L. J. Ann. Rev. Crim. Proc. (2015), pp. xi–xii.

Judge Kozinski's explanation describes Petitioner's situation: he accepted a guilty plea only because he caved to the pressure.

This leads to three cases the Government cites that are inapposite to Petitioner's case: United States v. Broce, 488 U.S. 563 (1989); United States v. Delgado-Garcia, 374 F.3d 1337 (D.C. Cir. 2004); and United States v. Fitzgerald, 466 F.2d 377 (D.C. Cir. 1972).  These cases all speak to the conclusiveness of guilty pleas, the difficulty in withdrawing those pleas, and the resulting procedural bars that often stem from them.  As already noted, Petitioner is not arguing to withdraw his guilty plea.  Instead, he argues that he is factually innocent of the second requirement of § 7202 and is therefore actually innocent of the underlying conviction.

As fully demonstrated above, there is no such procedural bar on actual innocence claims, and this Court has authority to and should review the merits of Petitioner's actual innocence claim.

9

As the late Justice Scalia concurred in Cheek, "The law already provides considerable incentive for taxpayers to be careful in ignoring any official assertion of tax liability, since it contains civil penalties that apply even in the event of a good-faith mistake, see e.g., 26 U.S.C. §§ 6651, 6653.   To impose in addition criminal penalties for misinterpretation of such a complex body of law is a startling innovation indeed." Cheek, at 208 (emphasis in original).

As noted above, Petitioner can raise other constitutional arguments that would otherwise be procedurally defaulted because those constitutional violations resulted in the conviction of one who is probably innocent.   But even if the Court chooses not to use the gateway the Supreme Court has permitted it to use, it may still review Petitioner's selective prosecution claim on the merits.

Recently, for example, the Arizona State BAR ethics committee disallowed prosecutors from excluding the right to raise a prosecutorial misconduct issue via plea waiver.   The committee recognized -- as other state ethics committees have previously -- that such a waiver "is inconsistent with prosecutors' role as a 'minister of justice' and is 'prejudicial to the administration of justice.'" See 97 Criminal Law Reporter (BNA) 414 (Exhibit 4).   The committee additionally noted that prosecutors -- like defense lawyers -- can "suffer from parallel conflicts of interest when they require defendants to waive their right to challenge those prosecutors' professional conduct." Id.

The Supreme Court has yet to explicitly address whether prosecutors may include waivers of any review of their conduct in a plea agreement, but it has commented on a similar -- albeit civil -- issue.   See Newton v. Rumery, 480 U.S. 386 (1987)   There -- as here -- the same type of agreement may "tempt prosecutors to trump up charges in reaction to a defendant's civil rights claim, suppress evidence of police misconduct, and leave unremedied

deprivations of constitutional rights." Newton, at 394.

Justice O'Connor's concurring opinion is even more illuminating:

[These types] of agreements potentially threaten the integrity of the criminal process and preclude vindication of federal civil rights. Permitting such [agreements] may tempt public officials to bring frivolous criminal charges in order to deter meritorious civil complaints. The risk and expense of a criminal trial can easily intimidate even an innocent person whose civil and constitutional rights have been violated. ... The coercive power of criminal process may be twisted to serve the end of suppressing complaints against official abuse, to the detriment of not only the victim of such abuse, but also of society as a whole.

Newton, at 399.

There are plenty of reasons -- as detailed in Petitioner's initial petition and below -- to review the merits of Petitioner's selective prosecution claim in the interest of justice.

Other than the procedural bar assertion, the Government makes only one bald allegation against the selective prosecution claim, "At the outset, the government categorically denies any political basis for the prosecution of the defendant." [D.E. 26, p. 9]. The Government offers no official statements or affidavits to support its claim. Critically, the IRS has made the same statement in the past and offered no support for it, only later to be exposed by President Barack Obama on May 15, 2013: "I've reviewed the Treasury Department watchdog's report, and the misconduct that it uncovered is inexcusable. It's inexcusable, and Americans are right to be mad about it, and I'm angry about it. I will not tolerate this kind of behavior in any agency, but especially in the IRS, given the power that it has and the reach that it has into all our lives." The White House, Statement by the President (May 15, 2013).

The Government also uses a few loaded words like "fantastic" and "specious" in an attempt to discredit Petitioner's argument, but it does not, however, respond to or specifically deny any of the factually supported information presented in Petitioner's brief. These facts -- as well as the

facts listed and supported below -- highlight the credibility of the misconduct claim.

First, a political reason existed to target Petitioner. Petitioner had a significant effect on the 2008 election. In fact, a vice president at Verizon Communications noted that Petitioner "has literally re-written the books on political campaign strategies." (Exhibit 5). National Public Radio named the technology developed by Petitioner's firm "the technology pick of the year." (Exhibit 6). The New York Times reported that Petitioner's technology makes voters "4.2 percent more likely to vote." (Exhibit 7). Importantly, CNN reported that Governor-Elect Bob McDonnell told President Barack Obama "that one of the reasons [he] thought he won is that [his team] hired the text messaging firm that [President Obama] had last year." (Exhibit 8). That firm was Petitioner's.

Early in 2009, after Petitioner disclosed that he had formed Tusk Mobile to work on behalf of Republican candidates, a senior Democrat operative called him a "[expletive deleted] traitor" and said that he would be "made to pay." (Exhibit 9, p. 3).

At the end of 2009, at a conference on technology and politics, several people told Petitioner that he had "embarrassed the President" and that he was on a "political hit list." Id.

Second, Petitioner provided numerous examples in his petition of similarly situated individuals -- but Democrat -- who were not prosecuted, and a compelling statistical disparity. The Government does not answer this statistical information provided on pages 5 through 8 of his petition and supported by Exhibits 2 through 13 [D.E. 24, pp. 17-20, and Ex. 2-13] because it has no answer.

Importantly, United States District Courts for the District of Columbia and the United States Court of Appeals for the District of Columbia have both affirmed the notion that using statistical data as a means of demonstrating

12

selective prosecution is not only appropriate but often the only means available to do so. See <u>United States v. Khanu</u>, No. 09-087(CKK), 664 F. Supp. 2d 28, 2009 U.S. Dist. LEXIS 99884 (D.D.C. October 13, 2009)(discussing selective prosecution and the discrimination one has to show to demonstrate he or she was targeted, "Because direct evidence of discrimination is rarely available, a defendant may use statistical disparities and other indirect evidence to show bias or discriminatory motive. See <u>Branch Ministries, Inc.</u> <u>v. Richardson</u>, 970 F. Supp. 11, 17 (D.D.C. 1997). However, 'statistical proof normally must present a 'stark' pattern to be accepted as the sole proof of discriminatory intent under the Constitution.' <u>McClesky v. Kemp</u>, 481 U.S. 279, 293, 107 S. Ct. 1756, 95 L.Ed.2d 262 (1987)(quoting <u>Arlington</u> <u>Heights v. Metro. Hous. Dev. Corp.</u>, 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)).").

The efforts to decapitate the two top Republican technology firms — Tusk Mobile and The Bivings Group — using the same infrequently prosecuted statute, has been effective for the Democrat Party.

After the 2012 election, the Washington Post asked, "How badly did Mitt Romney lose the technology fight?" and concluded Romney had lost badly because "one problem facing the [Republican] party is consultants who are okay or decent, but not the honest-to-God best in the business." (Exhibit 10). Politico "quoted Republican operatives as saying that Romney was leaving victories on the table for want of creativity. The Romney campaign was able to deploy all the same tools ... but was never able to point to an innovation that originated first in the Romney campaign and that yielded significant wins." (Exhibit 11).

For the 2016 campaign, the presumptive Republican nominee has hired his former golf caddie as his director of social media, (Exhibit 12), and his campaign is being sued for sending unsolicited text messages. (Exhibit 13).

Even conservative magazines are mocking the campaign's technology

13

efforts. (Exhibit 14). Certainly not the "honest-to-God best in business" by any stretch of the imagination.

Petitioner has demonstrated that this Court has authority to review his selective prosecution claim on the merits, that the claim is credible and supported by a compelling statistical disparity and an open criminal investigation on the IRS investigating agents, that the IRS had reason to target Petitioner, and that the results of Petitioner's prosecution has impacted the political process in favor of the Democrat party. This issue should be further developed at an evidentiary hearing.

This Court's failure to act on this issue is a tacit approval of Lady Justice lifting her blind fold to wink at her friends and target her perceived enemies. The merits of this issue must be addressed.

### PETITIONER'S INEFFECTIVE ASSISTANCE OF COUNSEL CLAIM IS NOT A REQUEST TO WITHDRAW HIS GUILTY PLEA AND REGARDS COUNSEL WHO WAS ACTIVELY REPRESENTING HIM DURING THE PLEA STAGE

The Government argues that Petitioner attempts to withdraw his guilty plea and should be held to the high legal standard applied in such circumstances. [D.E. 26, p. 8]. It also argues that Petitioner knew the rights he was waiving because the plea colloquy says so. Id., pp. 8-9. Both of these arguments are without merit.

Petitioner had never even heard of a § 2255 motion or a 60(b) motion at the time of his plea colloquy, and these had never been explained to him. Thus, he could not fully comprehend the rights he was agreeing to waive.

More importantly, however, Petitioner has made no argument that he is withdrawing his plea agreement, not does he desire to do so. As detailed above, the claims raised are not barred by the waiver because an actual innocence claim serves as a gateway for other constitutional claims. There is no need to withdraw the plea agreement before reviewing Petitioner's claims on the merits and/or ordering an evidentiary hearing.

The Government rightly agrees that Petitioner's ineffective assistance of counsel claim is fully permitted by his plea agreement, but it argues that the counsel Petitioner claims violated his Sixth Amendment constitutional right to counsel -- Cono Namorato -- was not Petitioner's counsel and was not involved at the plea agreement stage. Id., pp. 10-12. This is materially false.

Cono Namorato was retained on May 30, 2012 (Exhibit 1 - Letter of Engagement) and represented Petitioner through June 8, 2015 (Exhibit 2 - Letter of Termination) and even participated in conversations with Jessie Liu and Thomas Perrelli about the Sentencing Memorandum in preparation of Petitioner's sentencing on May 5, 2015. Mr. Namorato's representation only ended a month after Petitioner's sentencing, giving further credence to Petitioner's claims. An evidentiary hearing where counsels Jessie Liu and Thomas Perrelli would fully establish Mr. Namorato's ineffectiveness and the prejudice his ineffectiveness had on the proceedings as a whole, including the plea agreement stage.

Petitioner has made a colorable showing of the violation of his Sixth Amendment right to counsel supported by evidence outside the record. The facts that Petitioner has alleged regarding Mr. Namorato's representation -- if proved true -- would entitle him to relief. Thus, ordering an evidentiary hearing is warranted.

The fact that Mr. Namorato did not attend Petitioner's sentencing or plea agreement is insufficient to prove that Mr. Namorato was not involved -- as Petitioner has alleged and supported above -- in the plea agreement and sentencing stages. In fact, as Mr. Namorato would have to truthfully testify at such an evidentiary hearing, the plea negotiations started exclusively through Mr. Namorato. Petitioner later hired Thomas Perrelli and Jessie Liu because Mr. Namorato's representation notably decreased during that process, but Mr. Namorato's ineffectiveness so tainted the process up until that point

that Ms. Liu's and Mr. Perrelli's efforts to remedy Mr. Namorato's errors could not be fruitful.

An evidentiary hearing to further develop the facts of this claim through testimony under oath is necessary. Disposing of this claim without a hearing — as the Government requests — would result in a fundamental miscarriage of justice.

## CONCLUSION

For all the reasons listed herein — and especially in light of the Government's decision not to address the merits of Petitioner's actual innocence claim or his conflict of interest claim — Petitioner respectfully requests that this Honorable Court grant an evidentiary hearing to resolve the material disputed facts between the parties, or, in the alternative, grant the petition on the face and order Petitioner's release.

Respectfully submitted,

KEVIN DUANE BERTRAM

## VERIFICATION

I, Kevin Duane Bertram, declare under penalty of perjury that I have personal knowledge of all of the facts herein and that they are true and correct to the best of my knowledge as of this 11th day of July 2016.

KEVIN DUANE BERTRAM

## CERTIFICATION

I, Kevin Duane Bertram, declare under penalty of perjury that I served a copy of this motion on the US Attorney via First Class US Mail on this 11th day of July 2016.

KEVIN DUANE BERTRAM

16

PRISON MAILBOX RULE

I, Kevin Duane Bertram, declare under penalty of perjury that I handed this motion — correctly addressed and with sufficient postage — to prison authorities for mailing to the court on this 11th day of July 2016.  See Houston v. Lack, 487 U.S. 267, 277 (1988)(motion deemed filed on the date it is handed to prison authorities for mailing to the court).

KEVIN DUANE BERTRAM

**E X H I B I T   1**



Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
202-862-5000  202-429-3301 Fax
www.caplindrysdale.com

202-862-5090 Direct
cnamorato@capdale.com

May 30, 2012

Mr. Kevin Bertram
2937 Cathedral Avenue, N.W.
Washington, DC  20008

Dear Mr. Bertram:

The District of Columbia Rules of Professional Conduct require law firms to set out in writing at the beginning of a new representation the basis or rate of the fees to be charged. The purpose of this letter is to explain our fee arrangements and confirm the terms and conditions under which Caplin & Drysdale will represent you in connection with your tax matter.

The enclosed General Provisions explain our billing practices for fees and expenses. Our fees will be based primarily on the hourly billing rates established by the Firm's Management Committee for each attorney, which currently range from $245 an hour for new associates to $1,100 an hour for senior partners. My time is currently billed at $825 per hour, and Matthew Hicks' time at $475 per hour. Although I will be the one primarily responsible for this engagement, portions of the matter may be handled by other firm lawyers. In addition to fees, we shall be entitled to payment or reimbursement for costs and expenses as set forth in the General Provisions.

We will require a $25,000.00 retainer, for which a statement is enclosed. Unless you agree otherwise, we are required to hold the retainer in escrow, and our fees and expenses will be withdrawn only as they are incurred. In general, funds held in escrow remain your property and are protected from a lawyer's creditors, but you are taxable on any interest income related to the funds in escrow and would need to provide us with a Form W-9. For ease of administration, therefore, we would prefer to deposit the retainer into the firm's regular operating account where it will be treated as the firm's property upon receipt. In either case, we will bill you at the end of each month for the actual time charges and expenses incurred during that month, and you will need to pay that bill in full to restore your retainer to $25,000.00. At the end of the representation, we will apply the final bill and any outstanding balance on prior bills against the retainer and refund the balance, if any, to you. By signing below, you agree that we may deposit the

674211



Caplin&Drysdale
CHARTERED                           - 2 -

retainer into the firm's operating account.  If you have any questions about this, please contact me.

If the foregoing correctly reflects your understanding of the terms and conditions of our retention, please indicate your acceptance by executing the enclosed copy of this letter in the space provided and returning it to my office.

We are pleased to have this opportunity to work with you.

Very truly yours,

Cono R. Namorato

Enclosures

AGREED TO AND ACCEPTED:

By:_____
        Kevin Bertram

Date:  _____



Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
202-862-5000  202-429-3301 Fax
www.caplindrysdale.com

Kevin Bertram                                                    May 30, 2012
2937 Cathedral Avenue, N.W.
Washington, DC  20008

| | |
|---|---|
| Rolling Retainer for Professional Services | $25,000.00 |
| Total Balance Due | $25,000.00 |

### WIRE TRANSFER INFO:

ACCOUNT NAME:  CAPLIN & DRYSDALE, CHARTERED
BANK OF AMERICA
15TH & PENNSYLVANIA AVENUE, NW
WASHINGTON, DC 20013
ACCOUNT NO.:  0019 2081 4809
FEDERAL ROUTING NO.:  026009593

674214

E X H I B I T   2



Caplin & Drysdale, Chartered
One Thomas Circle, NW, Suite 1100
Washington, DC 20005
202-862-5000  202-429-3301 Fax
www.caplindrysdale.com

202-862-5090  Direct
cnamorato@capdale.com

June 8, 2015

Mr. Kevin Bertram
P.O. Box 65633
Washington, DC  20035

Dear Kevin:

Our firm policies generally require us to write a letter confirming the conclusion of an engagement with a client.  This provides a clear point after which our attorney-client relationship has terminated.  Accordingly, as of this date we will consider our engagement as your counsel over.  We have a policy that we will retain our files for a period of five years starting now, at the end of which, in the absence of a specific direction to the contrary from you, we will destroy them.

It has been a great pleasure working with you.   If Caplin can ever be of service again, please do not hesitate to call.

Very truly yours,

CAPLIN & DRYSDALE, CHARTERED

By: Cono R. Namorato

Enclosure

E X H I B I T    3



# THREE FELONIES
# A DAY

With a New Preface by the Author
Foreword by Alan M. Dershowitz

honest services fraud, conspiracy, and extortion. DiMasi's predecessor, Thomas M. Finneran, had also been federally indicted, for perjury and obstruction of justice. Likewise, Charles F. Flaherty, who served as House Speaker from 1985 until 1990, pleaded guilty in 1996 to tax evasion growing out of his alleged unlawful acceptance of gratuities. The day before Wilkerson's sentence, all three former Speakers appeared at the podium to greet and be cheered by the House members ringing in the new legislative session.

Timing was not on Wilkerson's side, as Judge Woodlock's incredulous tone made clear. Despite a decades-long series of federal political corruption prosecutions in the Bay State, "people go back to do it again," Woodlock lamented. "It's clear the sentencing imposed for criminal conduct here and, frankly, in other industrial states, hasn't been sufficient."[18]

Missing from the discussion was the possibility that recent Massachusetts House Speakers were not, in fact, so stupid, reckless, or obdurate that they committed serial felonies while unaware that the local U.S. attorney was still watching. As this book points out in Chapter [...] was accused of perjury but ended up plead- [...] crime of obstruction of justice, in no small [...] mised probation, rather than prison time, if [...] se analysis of his testimony under oath dem- [...] t, in fact, perjured himself. Charles Flaherty's [...] kewise controversial, with even the prosecut- [...] ding that "he had no proof that the speaker's [...] s had affected any legislation."[19] And Salvatore [...] part under the "honest services" section of the [...] te that the Supreme Court later narrowed con- [...] iculous examination of the evidence in these [...] whether these former House Speakers in fact [...] whether Finneran and Flaherty pleaded guilty to [...] tatutes simply because of the threat of lengthy prison terms [...] event of conviction. Astute observers of the federal criminal justice system have long since given up believing that the

guilty plea reveals *true* culpability. It's all too common for such pleas to be the product of risk avoidance at the expense of truth. In this sense, the scripted plea colloquy has become a big part of the corruption afflicting the entire system.

The behavior of such legislators has been dragged into the ambit of federal statutes vague enough to arguably encompass all manner of lawful, if self-benefitting, financial dealings. What may appear to federal prosecutors and judges to be felonious conduct, however, is often in accord with state law and longstanding political culture. If such culture is to change, it is a matter to be left to the voters—who in Massachusetts have chosen, for reasons of their own, to establish longtime one-party rule in the legislature. The result is a self-perpetuating political culture that has become ugly and dysfunctional, but not necessarily felonious. Where disfavored practices appear to carry the day, citizens would do well to express their outrage at voting booths, rather than allow unelected federal prosecutors to dictate their political choices.

Much like indicted pols, those in the financial realm accused of crimes aren't likely to engender public support. It's far more likely that the media will act as cheering section, rather than watchdog, regarding government assertions of power over such individuals.

Consider the trajectory of the Justice Department's high-profile campaign to put practitioners of "options backdating" in the dock. It all started when Erik Lie, a University of Iowa finance professor, published a paper demonstrating a glaring coincidence: It was extraordinarily common for public companies to grant stock options to their executives very shortly before marked increases in the stock price.[21] This, of course, made the options valuable—in the money—right away. Some news reporters, and then the Securities and Exchange Commission, began to delve into some of the examples. It turned out that, in fact, the options had been issued in many instances *after* the stock price increase, but were backdated to a period *before* the rise.

The news media, embodying the old adage that "dog bites man" is not news but "man bites dog" is, concluded that there must have been some species of fraud involved.[22] Later, the author of the study that started

E X H I B I T   4

News
97 Com. L. Rep. (BNA) 414
Lawyer-Client Relationship
July 1, 2015

**Editorial Information: Prior History**

By Samson Habte

### Opinion

Ethics rules forbid criminal defense lawyers to advise -- or for prosecutors to propose -- that defendants enter plea agreements requiring them to waive post-conviction claims alleging ineffective assistance of counsel or **prosecutorial misconduct**, the Arizona bar's ethics committee concluded in a June opinion (Ariz. State Bar Comm. on Rules of Prof'l Conduct, Op. 15-01, 6/15).

The opinion is the 13th state bar advisory to conclude that defense lawyers may not participate in plea agreements that are conditioned on a client's waiver of the right to seek post-conviction relief on ineffective assistance of counsel grounds.

That is now a majority view: of the 15 state bar panels to consider the issue, only two have concluded that lawyers may advise clients to waive IAC claims.

The Arizona committee also joined a smaller subset of bar panels in finding that prosecutors -- not just defense attorneys -- are prohibited from participating in plea deals that require defendants to forfeit post-conviction claims alleging deficient representation or **prosecutorial misconduct**.

**Reversing Course.**

The Arizona committee once took a different view on the propriety of advising a client to waive IAC challenges.

In Arizona Ethics Op. 95-08 (1995), it found that such a recommendation does not amount to a violation of Arizona Rule of Professional Conduct 1.8(h)(1), which prohibits lawyers from making agreements that prospectively limit their liability to a client.

"That opinion did not, however, examine the conflicts of interest inherent in these waivers," the panel said. "Having since examined both the conflicts of interest and the subsequent ethics opinions from other jurisdictions on this issue, we hereby withdraw Opinion 95-08."

Appellate waivers in plea agreements have generated controversy in recent years, as criminal justice reform advocates have urged courts to reverse the widely adopted view that ethics concerns about such agreements do not render them unenforceable. (*See box.*)

**Concerns for Defense Counsel.**

Rule 1.7(a)(2) provides that a conflict exists when there is a significant risk the lawyer's representation of a client will be materially limited by a personal interest of the lawyer.

Such a conflict exists when a lawyer is asked to counsel a client on an IAC waiver, the committee said, because "attorneys cannot be fully objective about challenges to the quality of their own representation, which they have an interest in avoiding or mitigating."

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44918083

CASE 1:15-cr-00012-ABJ Document 27 Filed 07/13/16 Page 30 of 67

The conflict "is quite formidable," the committee added, because successful IAC challenges "often (1) jeopardize the attorneys' future employment ..., (2) harm the attorneys' professional reputation, (3) serve as a prelude to professional discipline, and (4) serve as a predicate to the clients' later malpractice claims."

A lawyer's inability to be detached may also preclude him from complying with the obligation under Rule 2.1 to "exercise independent professional judgment and render candid advice," the committee said.

And because waivers will apply to "ineffective assistance claims arising from sentencing and other proceedings yet to occur," attorneys cannot adequately discharge "their duty to communicate sufficient information to enable the clients to enter informed waivers," the committee said, citing Rule 1.4(b).

"In light of defense attorneys' adverse interests, inability to communicate sufficient information to secure informed consent, and diminished ability to render objective advice when advising on their own performance, the resulting conflict of interest is not waivable," the committee stated.

**Concerns for Prosecutors.**

The committee also said prosecutors who propose plea deals containing IAC waivers risk violating Rule 8.4(a), which forbids inducing others to violate ethics rules. "By requiring defense counsel to participate in these waivers, prosecutors induce defense counsel to violate [Rule] 1.7 (and, depending on the facts, [Rules] 1.1, 1.4, and 2.1)," the committee said.



Other ethics rules are implicated when defendants are asked to waive **prosecutorial misconduct** claims, the committee said. Requiring that kind of waiver "is inconsistent with prosecutors' role as a 'minister of justice' and is 'prejudicial to the administration of justice,'" it said, citing Rules 3.8 and 8.4(d).

Additionally, prosecutors -- like defense lawyers -- can "suffer from parallel conflicts of interest when they require defendants to waive their right to challenge those prosecutors' professional conduct," the committee said.

**Two Exceptions.**

The committee said one narrow exception will allow a defense lawyer to participate in a plea agreement involving an IAC waiver when the client is informed of the lawyer's conflict and receives advice from independent counsel on the proposed plea deal.

The committee also identified a scenario in which prosecutors may offer plea deals that include waivers of **prosecutorial misconduct** claims.

Drawn from a resolution the ABA House of Delegates adopted in 2013, that exception applies to waivers "based upon past instances of [prosecutorial] conduct that are specifically identified in the plea or sentencing agreement or transcript of the proceedings."

Full text at http://www.azbar.org/Ethics/EthicsOpinions/ViewEthicsOpinion? *United States v. Shedrick* , 493 F.3d 292 (3d Cir. 2007); *United States v. Craig* , 985 F.2d 175 (4th Cir. 1993); *United States v. White* , 307 F.3d 336 (5th Cir. 2002) ("an ineffective assistance of counsel argument survives a waiver of appeal only when the claimed assistance directly affected the validity of that waiver or the plea itself") ( 72 CrL 15, 10 /2/02); *Davila v. United States* , 258 F.3d 448 (6th Cir. 2001) ( 69 CrL 556, 8 /15/01); *Jones v. United States* , 167 F.3d 1142 (7th Cir. 1999); *DeRoo v. United States* , 223 F.3d 919 (8th Cir. 2000); *Washington v. Lampert* , 422 F.3d

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.



44918083

864 (9th Cir. 2005); *United States v. Cockerham* , 237 F.3d 1179 (10th Cir. 2001) ( 68 CrL 369, 1 /31/01); *Williams v. United States* , 396 F.3d 1340 (11th Cir. 2005) ("there may be a distinction between [a] claim of ineffective assistance in entering or negotiating the plea versus a claim ... challenging the validity of the plea or agreement") ( 76 CrL 341, 2 /2/05).

BNACRM                                 3

© 2016 Matthew Bender & Company, Inc., a member of the LexisNexis Group. All rights reserved. Use of this product is subject to the restrictions and terms and conditions of the Matthew Bender Master Agreement.

44918083

E X H I B I T   5



Edward McFadden
Vice President
External Communications
1300 I Street, NW, Suite 400 West
Washington, DC  20005
Phone  202 515-2441
edward.s.mcfadden@verizon.com

February 22, 2010

Chrissa LaPorte
Director, Leadership and Exchange Programs
French-American Foundation

Dear Ms. LaPorte,

I am pleased to write on behalf of Kevin Bertram for his application to participate in the French-American Foundation's Young Leader Program.  As chairman of the steering committee for the American Council on Germany's Young Leader program, I know how difficult a task it is to work through the selection process for such a program, but let me assure you that in the case of Kevin, your deliberations should not take very long.

In my capacity as an executive with Verizon, I have had the pleasure of working with Kevin professionally, and have found him to be -- if not *the* -- then one of the rising stars in the high-tech, new media/social media arena. As CEO of Distributive Networks his vision for what an individual can accomplish with their mobile device -- whether for work, commerce or play -- has helped transform the way people shop online, watch a sporting event, or communicate with family and friends.

His innovative leadership in designing successful mobile campaign strategies for candidates such as President Barack Obama has literally re-written the books on political campaign strategies.  Most recently, Kevin's firm led the way the process that raised more than $10 million for Haitian earthquake relief, and helped get the bulk of that money to the island within one week's time.

In these examples, you see a common theme in Kevin's professional and personal life and work.  He uses his entrepreneurial success and leadership to drive transformative change for good ... for consumers and citizens and the culture.

Beyond the temperament and talents that will make him a standout delegate, my experiences with Kevin confirm that when he commits to a project, he does so fully.  In other words, you would be selecting an individual who will remain engaged and invested in the French-American Foundation for the long-term.

Which is all a long-winded way of saying that I cannot recommend Kevin highly enough, and hope you will look upon his application favorably.  If you have further questions, please don't hesitate to contact me.

Sincerely,


Ed McFadden
VP, External Communications
Verizon Communications

E X H I B I T   6



# 2008 Tech Pick: Campaign Text Messaging

December 29, 2008   6:00 AM ET

### Listen to the Story

**Morning Edition**

Even with the financial meltdown, technology companies have continued churning out gadgets or new advances of the devices we carry in our pockets, purses, or clip on our ears. Morning Edition tech guru Mario Armstrong selected one innovation as our technology pick of the year. He explains his decision to Renee Montagne.

*Copyright © 2008 NPR. For personal, noncommercial use only. See Terms of Use. For other uses, prior permission required.*

RENEE MONTAGNE, host:

2008 has been a productive year for technology companies. They've kept churning out gadgets or new advances of the devices we now carry in our pockets, purses, or clip on our ears. We asked Morning Edition tech guru Mario Armstrong to select one innovation as the technology pick of the year. And he's here to tell us what this is. Welcome, Mario.

MARIO ARMSTRONG: Hey Renee, thanks for having me. I can't believe you're tying me down to one pick.

MONTAGNE: That's how it goes with these sort of end-of-the-year things, but let's have it, what's your pick?

ARMSTRONG: All right. So my pick, don-da-da-da, is text messaging by the campaigns throughout the election. I believe the use of technology on our mobile devices overshadowed any other technology that came out this year.

MONTAGNE: OK, so well that's an actual use of technology, not, say, a new gadget. But many of us will remember one thing that loomed quite large, and that was the use of a text message by the Obama campaign to announce Barack Obama's vice-presidential pick. And it

was a sort of - people were like waiting for it the way they were waiting for the iPhone.

ARMSTRONG: Absolutely. This was the first time in history that this had been done. And it came out at 3 o'clock in the morning, Eastern time, and people still were lining up to wait to see who this pick was going to be on their mobile device.

MONTAGNE: What else did the campaigns do to make innovative use of technology?

ARMSTRONG: So they also took it a step further beyond just doing things like text messaging. I mean, some campaigns even created iPhone applications. These were programs that would actually run on your iPhone that would give you news, information, updates, even track your calls if you were making calls and being very active. But then there was this - just a mix, all of the pieces together - utilizing the Internet, utilizing email, text messaging, online video, things like YouTube and others.

I think the one thing for me, Renee, as to why this really stood out, is when I started meeting people that were older generation that really weren't into technology, but because of the election they found themselves gravitating and really utilizing and embracing technology in new ways, ways that they have never done before. And that has continued them now to have better connections with family, friends, and relatives.

MONTAGNE: Well, let's talk about, I think, what we could call iPhone moments because last year the iPhone swept headlines. You even chose it as your pick of 2007. Any parallel iPhone moments this year?

ARMSTRONG: There are a couple of parallel iPhone moments, and there are three devices that really come out that gravitate towards me - one is called the Peak. This is kind of like your iPhone, all it does, Renee, is email. It's a little device that you carry with you. No phones, no camera, no web browsing. All it does is it has a keyboard and a screen and it allows you to send and receive email. It's very simple, and it's great for the non-techie.

Another quick one would be the Pulse Pen, a pen that actually records what's being heard as you're writing, and then allows you to save that and kind of go back to your notes later and listen to any of your notes that you've taken. It's an awesome device.

And then I guess my last pick would be Xohm, this is a wireless service that has now come out. It's called WiMAX service, and it's now available in the U.S. And essentially what makes this different, is it is about three to four times faster than current wireless Internet speeds. So think of this as a hotspot as wide as your city, not a hotspot that just surrounds a coffee shop,

at really fast, blazing speeds.

So, Renee, those would be three other things that really caught my attention for 2008. But by far, the number one would be use of text messaging in the election.

MONTAGNE: All right then, 2008 in technology from Mario Armstrong, Morning Edition's regular technology commentator. Thank you.

ARMSTRONG: Thank you, Renee.

MONTAGNE: And of course, Mario also hosts the radio show Digital Cafe on Baltimore Public Radio station WYPR.

*Copyright © 2008 NPR. All rights reserved. No quotes from the materials contained herein may be used in any media without attribution to NPR. This transcript is provided for personal, noncommercial use only, pursuant to our Terms of Use. Any other use requires NPR's prior permission. Visit our permissions page for further information.*

*NPR transcripts are created on a rush deadline by a contractor for NPR, and accuracy and availability may vary. This text may not be in its final form and may be updated or revised in the future. Please be aware that the authoritative record of NPR's programming is the audio.*

## Related NPR Stories

Mercedes To Introduce Attention Assist To E-Class   Dec. 29, 2008

2008 Shaping Up To Be A Bleak Trading Year   Dec. 29, 2008

Post-Holiday Sales Won't Fix Spending Doldrums   Dec. 29, 2008

© 2014 NPR

E X H I B I T   7

**The New York Times**
nytimes.com 

August 18, 2008

# Enticing Text Messagers in a Get-Out-the-Vote Push

By BRIAN STELTER

R U curious to know Obama's VP?

The names of vice-presidential candidates are typically announced at news conferences or political conventions. But sometime before the opening gavel of the Democratic National Convention next Monday, Senator Barack Obama plans to break the mold by doing it with a text message.

Last week, the Obama campaign said that anyone who sent a text message of "VP" to a dedicated phone number would be among the first to learn the identity of his running mate. The campaign has also run a television commercial that offers a campaign sticker to any person who sends the word "Barack" to the same number.

The efforts spotlight Mr. Obama's push to harvest millions of cellphone numbers of potential voters through text messaging, a technology that is increasingly moving into the mainstream. And it could have a significant effect in November, when the campaign plans to use the technology to get out the vote.

The campaign is drawing on its technological know-how and its support among younger voters, who as teenagers and younger children embraced the technology — often surreptitiously in their classrooms.

The strategy stands in sharp contrast to that of the presumptive Republican nominee, Senator John McCain, who does not use text messaging and rarely uses the Internet, and whose campaign does not send text messages to supporters.

Mr. Obama's campaign has been encouraging people to sign up to receive text messages since last summer, and the effort to add names and numbers to its huge voter database has become more aggressive as the election nears. Such recruitment will be especially intense on college campuses.

Researchers are only beginning to study the effects of text messaging on get-out-the-vote efforts. A study of 4,000 people released last September found that those who received a reminder in a text message one day before an election were 4.2 percent more likely to vote, said a co-author of the study, Allison Dale, a graduate student at the University of Michigan.

Todd Rogers, the executive director of the Analyst Institute, said the findings were surprising because past research has shown that "the more personal a mode of contact, the more effective it is." But, Mr. Rogers said, the impersonal nature of text messaging might be offset by the novelty of the medium. Researchers plan to run new experiments this year to test the strategy.

The Obama campaign may be running the biggest text messaging experiment. Ms. Dale said Mr. Obama's

plan was clever. "They're enticing people with a little bit of information," like the vice-presidential pick, she said, "and once they have those numbers, they can use them again for mobilization."

Though the campaign will not disclose how many people have sent text messages to its phone number, analysts say the number is under a million because of the limited use of the messaging.

The Obama campaign has sent text messages to subscribers to alert them about speeches to be shown on television. But, said Todd Zeigler, a senior vice president at the Bivings Group, an Internet consulting firm that has advised Republican candidates, the technology is still in its infancy as a political mobilization tool.

"A lot of people simply don't use text messaging yet," Mr. Zeigler said, "and a lot of the people that do use it are reluctant to sign up to receive mass text updates."

So the Obama campaign has had to grapple with text etiquette. Chief among the challenges is figuring out how many text messages can be sent before they become as annoying as spam, especially given that some cellphone users are charged for each message.

"It should be used judiciously — only send something out if you actually have something important to say," Mr. Zeigler said. Indeed, in the study conducted by Ms. Dale, 10 percent of cellphone users who received the voting reminder said they were annoyed by it.

Scott Goodstein, who is in his mid-30s and has a dozen years of experience running campaigns, is trying not to be annoying. From the Obama campaign headquarters in Chicago, he manages the lists of voters who have signed up for text messages.

"Politics always strives to be about a one-on-one conversation," Mr. Goodstein said in an interview in May. "We're betting that these subscribers are young folks who haven't been reached out to before."

On his computer, Mr. Goodstein can scroll through lists of cellphone numbers and sort the groups by area code, ZIP code or other demographic information. Demonstrating that tool, he pointed to a list of hundreds of supporters who said they lived in Broward County, Fla., and showed how he could send a message to them about a rally planned for the next day.

In addition, every message Mr. Goodstein sends includes a request to forward the message to others.

Campaign officials say they want text messaging to feel like a dialogue. When subscribers reply and ask questions about basic political issues, the software sends an automated answer; other questions may receive replies from a campaign staff member.

Jim Goldstein, 38, a Web strategist from San Francisco, said he signed up for the text messages because they offered a direct channel to the Obama campaign. The prospect of being one of the first to hear about the vice-presidential pick was especially enticing, he said.

"It's not often in this day and age that a voter is made to feel like they're being put first versus the press, big donors and lobbyists," Mr. Goldstein said.

EXHIBIT  8

1/17/2014      Obama calls McDonnell to offer congratulations – CNN Political Ticker – CNN.com Blogs

Digg
del.icio.us
reddit
MySpace
StumbleUpon
4 years ago

# Obama calls McDonnell to offer congratulations



Posted by
CNN Political Producer Peter Hamby



Virginia Gov.-elect Bob McDonnell, a Republican, told reporters Wednesday that President Obama called to wish him congratulations after his win Tuesday.

RICHMOND, Virginia (CNN) - Virginia's Republican Gov.-elect Bob McDonnell took a congratulatory phone call from President Obama the morning after his landslide victory over Democrat Creigh Deeds, McDonnell told reporters Wednesday.

The call came shortly after 11 a.m. this morning, he said.

"He was exceptionally gracious and kind," McDonnell noted. "We had a couple of laughs. He said that be sure the first thing you do is thank your wife."

"He also told me he thought we ran a very good campaign that it was a good contest, and now that the campaign was over he hoped we would work closely together to govern, especially with Virginia being a neighboring state to the District of Columbia," he said.

The White House said Wednesday that the president called the winners of all of last night's races, including Republican Gov.-elect Chris Christie of New Jersey, Democrat Bill Owens of New York's 23rd congressional district, and independent New York City Mayor Michael Bloomberg.

The Republican added that he and his campaign manager Phil Cox also chatted with White House senior adviser Valerie Jarrett.

McDonnell also joked that he borrowed a page from the president's successful 2008 campaign playbook.

"I commended him and in fact told him that one of the reasons I thought we won is that we hired the text messaging company that he had last year," he said.

McDonnell was referencing Tusk Mobile, a division of Distributive Networks, the mobile marketing firm that helped the Obama campaign target voters in 2008. McDonnell hired Tusk Mobile in the early days of the governor's race, and his advisers believe he is the first Republican to have successfully leveraged an aggressive text messaging strategy in a high-profile campaign.

Filed under: Bob McDonnell • President Obama

---

### From Around the Web

- Michelle Obama's DNA Test Show Slave Owner as Ancestor Ancestry.com
- Who Actually Earns $400,000 Per Year? Moneyning.com
- Why Jeremiah Wright can't hurt President Obama anymore the Grio
- 5 Nicest Cities in America Mainstreet
- What Your Hair May Say About Your Heart AARP.org
- Not Only Are Conservatives Fed Up With Obama, New Report Indicates Michelle Wants Divorce Downtrend

### More from CNN

- Another ex-official may be subpoenaed by N.J. state legislature
- Lawyer: Brain-dead teen Jahi McMath stabilizing after move from hospital
- Report: Lily Tomlin marries Jane Wagner
- Mother of toddler in 'thug' video says her son is smart, does not curse
- Mayor fights his inner Rob Ford
- Mother of 'thug' toddler speaks out after video goes viral

Recommended by

soundoff (24 Responses)

1.

*TBA*

Now the question is McDonnell going to bow down to Rush Limbaugh like Micheal Steele does?

November 4, 2009 06:19 pm at 6:19 pm |

2.

*suresh*

E X H I B I T   9

Kevin Bertram
2937 Cathedral Avenue, NW
Washington, DC 20008

Treasury Inspector General for Tax Administration
P.O. Box 589
Ben Franklin Station
Washington, DC 20044-0589

My name is Kevin Bertram and I would like to report serious misconduct by the Internal Revenue Service Criminal Investigation Division. The misconduct is that some investigations and recommendations for prosecution are being made not on the merits of the individual cases but instead on a partisan basis and on how they can affect the outcomes of elections in the United States.

In 2004, I founded Distributive Networks, LLC, which developed mobile content and technology. In 2005, I hired my first employees and initiated a contract with Paychex "to pay to proper taxing authorities the payroll taxes" and to "prepare, sign, and file with proper taxing authorities all returns for such taxes on an ongoing basis." (see TIGTA-1 2005 Paychex Contract with Distributive Networks).

The company was initially very successful. From 2004 to 2006, Distributive Networks revenues grew by 4,261 percent and in 2007 the company was named the second fastest growing small technology company in the United States by Deloitte & Touche (see TIGTA-2 Distributive Networks Named Rising Star in Fast 500 Program). I believed as the owner that, rather than pocketing all of the profits, I had an obligation to my employees to provide as high salaries and top-notch benefits as possible. Thus, the minimum salary at Distributive Networks was initially $50,000 per year (and, later, $60,000). The benefits package was extensive, including 100% paid medical, dental and optical premiums for employees and dependents including domestic partners; twenty paid holidays; 100% 401(k) match; tuition reimbursement; and many other benefits (see TIGTA-3 Washington Post Overview of Distributive Networks). Not surprisingly, Distributive Networks was named both a "Great Place to Work" by Washingtonian magazine (see TIGTA-4 Washingtonian Great Places to Work) and the Washington Business Journal (see TIGTA-5 Washington Business Journal Top 50).

In early 2007, two items of note occurred. First, is that my Director of Operations, who had previously handled payroll, left for a new job. Second, is that Distributive Networks was hired by the Obama for America campaign to design and implement their mobile and social media strategy. Although frustrated by the scope creep of the work – we would end up losing more than $1,000,000 working for the campaign – it was the best and most exciting professional endeavor that I have ever been a part of. I also, perhaps naively, believed that President Obama could really change the political cynicism of Washington, DC.

In November 2007, Paychex stopped paying over the payroll taxes that Distributive Networks owed because "the electronic funds transfer that was generated as part of your recent payroll processing to move funds from your bank account to Paychex was unsuccessful." (see TIGTA-6 Paychex Notification November 2007). My recollection is that this happened because Paychex failed to process a bank account update that I provided to them, but I lack any documentation of this. This notification was sent to an address that Distributive Networks had not been at for several years and I did not receive it (it has been provided to me by the government). I do not believe I was aware of the unpaid payroll taxes until early in 2008 when I began gathering documents for my personal income taxes.

In November 2007, Paychex also stopped filing Form 941 for Employer's Quarterly Federal Tax Return. This was not in accordance with their contractual obligations and at no time did they notify me that they had stopped filing these forms. Paychex continued to generate and file all other forms, including employee W-2 statements. Paychex claims that they were sending completed Form 941's to Distributive Networks, but, again, these were being mailed to an address that Distributive Networks had not been at for several years. (see TIGTA-7 Paychex Generated DN Form 941). I was not aware that these forms had not been filed until 2012.

At this point I was deeply engaged in the presidential campaign, I took two important steps. First, Distributive Networks engaged the law firm of Sonnenschein Nath & Rosenthal to assist Distributive Networks in "exploring corporate finance growth opportunities" with the direction that my "strategic priorities included i) protecting the employees and the talent necessary to grow the Company and ii) honoring all federal and state payroll obligations." (see TIGTA-8 Declaration of Margaret Kavalaris). At no time was I advised that the failure to pay payroll taxes promptly was a criminal offense.

Second, Distributive Networks hired Jeff Lee as its President to "guide the firm's strategic planning, finance and operations." As Mr. Lee was a former CEO with an MBA and an initial salary of $300,000 per year, I felt comfortable that whatever accounting issues and outstanding payments would be resolved and I could focus on the presidential campaign.

The impact of our work on the presidential campaign was significant. NPR called "text messaging by the campaigns throughout the election" (see TIGTA-10 NPR 2008 Tech Pick – Campaign Text Messaging) the technological innovation of the year. The New York Times recognized that our program "could have a significant effect in November, when the campaign plans to use the technology to get out the vote." (see TIGTA-11 Enticing Text Messagers in a Get-Out-the-Vote Push – NYTimes). While I believe the impact on the general election was not that significant (except for the Minnesota Senate race), I believe that it is more likely than not that our work made the difference in determining who won the Democratic nomination. The National Journal reported that, "Hillary Clinton would have been the nominee but for the Internet, and she would have

secured the nomination – as her campaign expected – by Super Tuesday." (see TIGTA-12 New Media as the Message – National Journal). An article in the New York Times noted that our program helped Barack Obama win "the 18-to-24-year-old bracket by nearly 40 points, the largest split of any age group. " (see TIGTA-13 Why Obama Will Announce His Running Mate by Cellphone NYTimes). I provide this information only as background as to why I was later made a priority by the Internal Revenue Service's partisan activists.

After the campaign was completed, I reviewed the status of the company. In addition to losing over $1,000,000 working for the Obama campaign, we also had over $2,000,000 in accounts receivable (that ultimately would never be paid to us). To make matters worse, Jeff Lee had made no progress on resolving our outstanding payroll tax obligations. This put the company in a very delicate financial situation, so we took two steps. First, is that I set up a separate company called Tusk Mobile to work with Republican campaigns and conservative organizations, with the profits benefiting Distributive Networks. Second, is that we sought out financing to help stabilize the company and meet our payroll tax obligations. Let me deal with both of those in some detail.

One of the first clients of Tusk Mobile was the McDonnell for Governor campaign (see TIGTA-14 Tusk Mobile Clients). At the same time, during the Democratic primary, Creigh Deeds was indirectly a client of Distributive Networks. I say indirectly because our contract was with Revolution Messaging, a company run by Scott Goodstein, the former External Online Director of the Obama for America campaign. Once Creigh Deeds became the Democratic nominee, I informed Scott Goodstein that although the companies, staff and servers were all separate, there might be a conflict as the two campaigns would now be competing directly against each other. Scott Goodstein replied that I was a "fucking traitor" and that I would be "made to pay." The agreement between Distributive Networks and Revolution Messaging was then terminated.

In November, Bob McDonnell handily defeated Creigh Deeds and President Obama called to wish him congratulations. CNN reported that McDonnell told Obama, "that one of the reasons I thought we won is that we hired the text messaging company that he had last year." CNN continued that "McDonnell was referencing Tusk Mobile, a division of Distributive Networks, the mobile marketing firm that helped the Obama campaign target voters in 2008." (see TIGTA-15 Obama calls McDonnell to offer congratulations - CNN). After this happened, I heard from numerous people – primarily at a conference on technology and politics - that I had "embarrassed the President" and that I was on a "political hit list."

Let me turn now to the loan that we received in April 2009. I am going to provide quite a number of details only to highlight how outrageous the Internal Revenue Service recommendation to prosecute truly was. As I related before, Jeff Lee, the President of Distributive Networks, was in charge of finance and operations. He selected an accounting firm (Rose Financial) and was the point of contact with Paychex. And from April 10, 2009 to June 16, 2009 he was in charge of Distributive Networks. My daughter was born prematurely on April 11 and she soon dropped to under five pounds.

My wife experienced both physical and mental post-partum issues. She experienced continually bleeding and on June 8, we rushed to the hospital and learned that a significant part of the placenta had remained inside of her and had become seriously infected. She remained hospitalized for two days. I apologize for the graphic detail, but over this time period the health of both my wife and daughter was obviously paramount to me. I was available to Distributive Networks perhaps at one-quarter time, attending two conferences and a handful of business development meetings.

On April 28, Jeff Lee emailed me that the estimated payroll tax due (both state and federal) and that "these amounts will be promptly addressed upon closing." (see: TIGTA-16 Payroll tax schedule – Email). The loan – from Gemini Partners – closed on April 30. On May 7, Jeff Lee cc'd me on an email to Rose Financial that he had "sent one of our folks up to your office with a stack of items we need to ask you to cut checks for." (see TIGTA-17 Payment to Rose – Email). This is because he was determining what liabilities to pay. On the same day he directed Rose Financial to print a check for a small amount due for Montana state taxes – which was appropriate, as he was also in change of resolving our payroll tax liabilities. (see: TIGTA-18 Montana tax due – Email). On May 8, Jeff Lee sent an email to Gemini Partners that he "spoke with someone from the Department of Revenue yesterday and resolved one of the open items." (see TIGTA-19 Referral – Email). On May 19, Jeff Lee sent an email to Paychex reinstating the 401k program including the 100% employer side match but not the TaxPay program. (see TIGTA-20 Request forms signed – Email). I note that Jeff Lee forged my signature on these documents, as that is not my handwriting or signature. (see TIGTA-21 DN Paychex forms). On June 3, Jeff Lee responded to an email from our executive assistant that he would return a call concerning payroll tax issues. (see: TIGTA-22 Phone call – Email). On June 4, Jeff Lee cc'd me on an email with Paychex about breaking out the payroll obligations by state and federal accounts, because he was the responsible person on determining what and how to pay the outstanding payroll taxes. (see TIGTA-23 Any luck on the state by state breakout – Email).

I provide all of these details to prove that Jeff Lee was running the company when we received the loan, he worked out with Rose Financial who to pay and he failed to pay any federal payroll taxes or even engage a firm to begin discussions with the Internal Revenue Service. Is it really the contention of the Internal Revenue Service that I was an appropriate prosecution target because the MBA-educated President of the firm frittered away the loan proceeds while I was attending to my wife whose situation ended up being life-threatening and my daughter who was in need of significant care in the first two months of life?

I include one more email, this from October 2009. Caroline Ciraolo, at the time Chair of the Tax Controversy and Litigation practice group at Rosenberg Martin Greenberg, LLP and now the Acting Assistant Attorney General in charge of the Department of Justice Tax Division, was engaged by Distributive Networks in resolving our payroll tax issues. I do not have a declaration from her, but I include an email from Jeff Lee, who was still the point person on our payroll tax issue, where she directs Distributive Networks to NOT pay its federal payroll taxes – "She said that we're best off taking the money we

were going to pay for September Payroll Taxes, and using it for the MD Amnesty program." (see TIGTA-24 I spoke with Caroline – Email).

For October 2009, we were finally returned to the Paychex TaxPay system (see TIGTA-25 Paychex Tax Deposit Notice 10-15-09). From that point on, a trio of people installed by the lenders -- Roy Kim, Will Clemens and Phil Sweatman – became the decision-makers for Distributive Networks. A memo from Rosenberg Martin Greenberg highlights both my efforts and ultimate lack of authority to complete this process (see TIGTA-26 Ciraolo Memo).

Let me now move to my first meeting with the Internal Revenue Service. In January 2009, I had refiled my 2007 personal income tax return to decrease my Schedule C1 gross receipts by $500,000. This triggered an examination by the Internal Revenue Service, scheduled for December 1, 2009 (see TIGTA-27 IRS Audit Notice). The notice said that "we examine tax returns to verify the correctness of income, deductions, exemptions and credits."

I arrived at the examination with all of my financial documents and when I met the examiner, he had an autobiography of Barack Obama on his desk. We spent fifteen minutes discussing my firm's work for the Obama campaign and it became very clear that the examiner did not know about Tusk Mobile. It was perhaps the friendliest and easiest examination in the history of the Internal Revenue Service. In two weeks, my adjustment had been accepted and the Internal Revenue Service made other adjustments that worked in my favor. I received notice of this on December 17 (see TIGTA-28 IRS Adjustment and TIGTA-29 IRS Exam Changes). I received the resulting refund on December 31 (see TIGTA-30 IRS Refund Check).

During the examination, I highlighted (as was obvious from my financial records) the outstanding balance due on Distributive Networks' payroll taxes and expressed my concern about it. I asked if the resulting refund should be directly applied to the balance and he explained that I had not yet been assessed as the "responsible person" and so was not yet my personal (as opposed to business) obligation so the refund could not be directly applied. He recommended that once I had been designated the responsible person that I participate in the "Offer in Compromise" program. I asked again to confirm that I was not in "any trouble" and he replied, "Don't worry, we take care of our own." I can only speculate as to what that meant. I understand that an Internal Revenue Service examination agent is not there to provide me with legal advice. However, I was clearly acting in good faith in regards to the outstanding payroll taxes.

In 2010, I completed the sale of Distributive Networks. In the selling documents, I represented that all payroll tax returns had been filed (as was my understanding) and that I would be responsible for the payment of those payroll taxes. (see TIGTA-31 Schedule 3.1.6a). I set up a company, DN Wrapup, to pay out outstanding liabilities, including the outstanding payroll taxes. (see TIGTA-32 DN Wrapup IRS EIN). Dickstein Shapiro had advised me on the sale of the company in 2010 and in 2011 I engaged Lawrence Garr of Dickstein Shapiro as how to proceed in contacting the IRS about the outstanding payroll liabilities. His advice was that "the IRS would eventually

assess Distributive Networks' outstanding payroll liabilities against him in his individual capacity as a responsible person under 26 U.S.C. 6672. I advised that he could wait until then before making arrangements with the IRS to pay the liability." (see TIGTA-33 Lawrence Garr Declaration).

On May 16, 2011, I received a letter requesting the filing of Employment Tax Returns for 2008 and 2009. It is shocking that this letter reached me – it was addressed to "Kevin BertMAN" and to an address that I had not been at since 2004. It was sent by the same Small Business/Self-Employed Division that had conducted my audit, so it is not that they did not have my mailing address. If they had sent additional requests to this mailing address, I did not receive them. I immediately brought this to the attention of Lawrence Garr and, as he declares, "we had always operated with the understanding that although certain payments had been delinquent, all appropriate tax returns had been filed." He further declared, "I did not take any further action, nor did I advise Mr. Bertram to take any further action. In retrospect, it is clear to me that Mr. Bertram believed that his company had filed the appropriate tax returns, that he took the delinquency seriously, and that he wanted to pay what was owed." (see TIGTA-33). Thus, I waited for the Internal Revenue Service to contact me about the amount owed and then make arrangements to pay the outstanding taxes. Instead, on May 21, 2012, I was visited at my home by a special agent and a former special agent with the Criminal Investigation Division.

I have reviewed the Internal Revenue Service "How Criminal Investigations Are Initiated" document. It reads "Criminal Investigations can be initiated from information obtained from within the IRS when a revenue agent (auditor) or revenue officer (collection) detects fraud. Information is also routinely received from the public as well as from ongoing investigations underway by other law enforcement agencies of by United States Attorneys offices across the country." (see TIGTA-35 How Criminal Investigations Are Initiated). There was no fraud here. There was no other case. None of the steps outlined in the Treasury Inspector General for Tax Administration "Trust Fund Recovery Penalty Actions Were Not Always Timely or Adequate" were followed.

There were two people who arrived at my home for the interview. The first person was Emily S. Taylor, who identified herself as a special agent. Her father is also a special agent, so she is well-versed in the toxic culture of the Internal Revenue Service. (see TIGTA-36 Government and Public Administration). The second person was Mary C. Balberchak, who identified herself as a "consultant." I spoke with them without an attorney because I had been expecting to be contacted by the IRS to begin payment of the outstanding payroll taxes. They asked me if there were any other responsible parties at Distributive Networks. Although I am obviously not thrilled with the performance of Jeff Lee, I told them as the owner that the outstanding obligation (to pay) was entirely mine. They asked several times why we had stopped filing the Form 941s, and I repeatedly answered that my understanding is that Paychex had filed them, just as they had provided my employees with W-2s.

Then the conversation took a strange turn. Balberchak asked me about Tusk Mobile. I found this odd because Tusk Mobile's payroll taxes had all been paid in a timely

manner. Balberchak asked me, "so after working for President Obama, why did you begin working for the President's enemies." I was surprised at this question. Then she asked if I would be working on the 2012 election. I said that I had worked briefly in the Republican primary and that I had reached out to the Romney campaign about problems in their use of technology, but considering the visit by the IRS, I would not follow up. Balberchak then said that "that is a smart move."

Balberchak then began to ask me about certain Tusk Mobile clients. I was surprised that she did not ask about Tusk Mobile's work for Bob McDonnell. She did ask question after question about Tusk Mobile's work for Scott Walker in 2010. Was there coordination between the Scott Walker campaign and the Wisconsin state Republican party? Was there coordination with other outside groups? Did any outside groups pay us for work we did for Scott Walker? Did any other client pay to send messages on behalf of Scott Walker? Did we have any contact with the Republican Governors Association?

Balberchak also asked several questions about another client, the National Taxpayers Union. She asked if I identified with their goals (I declined to answer this question), if they sent any messages advocating or opposing any political candidates, and several questions about fundraising and if other third parties were paying us to do work for them. She also asked questions about some organizations that were not clients of Tusk Mobile and that, in some cases, had never even heard of.

I implore you to investigate why an IRS consultant during an investigation into unpaid payroll taxes is calling some of my former clients "enemies of the President" and that not participating in the political process is "a smart move."

On June 24, 2013, I was referred for prosecution to the Department of Justice. (see TIGTA-37 IRS Referral for Prosecution).

As you can imagine I am sorely disappointed that this referral occurred – and very surprised. I did a quick search of persons with payroll tax issues and found the following:

According to The New York Times, Al Sharpton's National Action Network "appears to have been sustained for years by not paying federal payroll taxes on its employees." Mr. Sharpton has not been prosecuted, and in fact was "among a small group at the White House when Mr. Obama announced his nomination of Loretta E. Lynch" to become the next attorney general. (see TIGTA-38 As Sharpton Rose So Did His Unpaid Taxes).

Also according to The New York Times, Timothy Geithner, while working for the International Monetary Fund, failed "to pay his payroll taxes, [and] he in effect kept the money the I.M.F. had contributed toward his liability." Mr. Geithner has not been prosecuted, and served as President Obama's Secretary of the Treasury. (see TIGTA-39 Geithner Questioned on Tax Returns).

According to The New Republic, Seth Bannon, "an Obama campaign alumnus," whose company helped "nonprofits like the AFL-CIO and the Texas Democratic Party," "owed the IRS roughly half a million dollars because it hadn't paid payroll taxes for several years." Mr. Bannon has not been prosecuted and his company was allowed to pay its back taxes. (see TIGTA-40 How Tech Investors Are Failing Due Diligence).

According to the North Carolina Capitol, Democratic party Chairman Randy Voller owes "more than $225,000 to the federal government for several years of unpaid [payroll] taxes." Mr. Voller has not been prosecuted and is still active in politics. (see TIGTA-41 Doors could close at historic NC Dem HQ).

According to tax lien records, Texas Democrat State Representative Mark Homer, "failed to pay over $145,000 in federal payroll taxes for a company he owns." (see TIGTA-42 Federal Tax Liens Filed Against Rep Mark Homer). Mr. Homer has not been prosecuted.

According to The Columbus Dispatch, Eric Kearney, who had been a Democratic candidate for Lt. Governor in Ohio, owed more than $825,000 in unpaid payroll taxes. Although Mr. Kearney withdrew from the race, he has not been prosecuted. (see TIGTA-43 Kearney's total tax debt $825,000).

According to The Virginian-Pilot, Democratic City Councilman Paul Riddick's business "failed to pay more than $200,000 in employment taxes over the past 14 years." Mr. Riddick has not been prosecuted and still represents Ward 4 in Norfolk, Virginia. (see TIGTA-44 Feds claim Norfolk councilman owes $246,000 in unpaid taxes).

I do not mean to suggest that nonpayment of payroll taxes is acceptable. On the contrary, it is a significant and widespread problem - but a problem that is best resolved through the civil process.

I looked into the number of prosecutions for employment tax issues in the Washington, DC area from 2010-2012 and I could only find one other prosecution, that of Frank Bivings and Isabelle Blanco of The Bivings Group. (see TIGTA-45 DOJ Bivings PR). This is very curious. The Bivings Group was widely viewed as the top Republican social media firm. I was widely viewed as the top mobile person who would work for Republicans. What are the odds of that these criminal investigations would occur prior to the 2012 election?

The odds are 1 in 350,000,000 – one in three hundred and fifty million. According to the GAO, as of September 30, 2007, over 1.6 million businesses owed over $58 billion in unpaid payroll taxes (see TIGTA-46 GAO Businesses Owe Billions in Federal Payroll Taxes). That number is widely estimated to have increased to two million businesses during the economic crisis. If those businesses are equally distributed by population then that means 37,400 businesses in the Washington-Arlington-Alexandria area had unpaid payroll taxes. (see TIGTA-47 One in Three Hundred and Fifty Million Calculation). That means selecting one of these two parties for prosecution is a 2 in 37,400 chance – meaning 1 in 18,700. For both to be selected, you multiple 1 in 18,700

times 1 in 18,700 -- and you get 1 in 349,690,000.  Call it 1 in 350,000,000.  That is simply too much coincidence.

The IRS Mission is to "provide taxpayers top quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all." (see TIGTA-48 IRS The Agency its Mission and Statutory Authority). The IRS is failing in this mission.  In my particular case, the IRS failed on the first part by providing incorrect information during my audit, sending notices to incorrect addresses and by not allowing me not satisfy my tax obligation once I was visited by the special agents. The IRS failed on the second part because their enforcement is not being done with integrity and is not being done with fairness to all, but instead on a partisan basis.

I implore the Inspector General to investigate the Criminal Investigations Division of the Internal Revenue Service for political bias in its recommendations for prosecution.  I implore you to find out more details about if there was a political information gathering program that the "consultant" Mary Balberchak was a participant.

Signed,


Kevin Bertram

E X H I B I T   10

# The Washington Post

## Post Politics

# How badly did Mitt Romney lose the technology fight?

**By Rachel Weiner**  November 9, 2012

Time Magazine has a deep dive into the work of President Obama's data team, something Slate's Sasha Issenberg has been following for months. The upshot: Democrats used data to refine their fundraising, persuasion and turnout operations in ways Republicans have failed to do.

On technological innovations, Romney's campaign was sometimes just a little behind, as with a Square app for collecting donations by mobile phone. At other points they were months behind, as with launching an automatic "quick donate" system. The initial Romney Web site for that feature initially used copy lifted wholesale from Obama's page.

Obama's campaign engaged supporters with eye-catching, interesting infographics. While Republicans pushed back on those campaigns on social media, they were still reacting to someone else's initiative.

"You can't really look at anything the Romney campaign did that was new and different, that was innovative," Nick Judd, managing editor at TechPresident told the Post.

And as Slate has reported, Obama's team engaged in massive experimentation with data and voter contacts, leading to a huge success in targeting and turning out voters.

Aides told the Washington Examiner that Project ORCA, touted by the Romney campaign as an untouchable, state-of-the-art smartphone-based poll monitoring program, gave misleading results on Election Day and then crashed.

So what happened? Here's what we found.

Romney didn't begin staffing up his digital campaign until after the primaries. Digital director Zac Moffatt acknowledged in September that the Obama team had years to build and improve on its own tools; Romney's web team didn't really get going until after the primaries.

"Comparing us to the Obama campaign straight up, it's really apples to hamburgers," Moffatt told the Post. "They had

four years, we had five months." He points to huge online fundraising, Web site hits, and voter contacts as evidence that the divide is overblown. "For us to be almost at parity" with Obama, he said, is "a testament to how we successful we are."

Since losing in 2004, in part thanks to Republicans' success at microtargeting, Democrats have been building their data. The GOP hasn't.

"The Democrats are sitting on a warehouse of information that is exponentially larger and are able to derive more insights because of the time frame at which they've been collecting, analyzing and massaging that information," said Cyrus Krohn, former digital director at the Republican National Committee.

**The Daily Trail newsletter**                                              Sign up

A daily briefing of what's happening on the campaign trail.

The GOP, he says, keeps starting over: "When a new chairman is brought in to run the party, in most cases they throw out of all of the technology and the people that were building technology."

Democrats also benefited from a web culture that goes back to Howard Dean's 2004 campaign.

"Digital is viewed and treated within the progressive community as a tool by which we achieve empowerment against entrenched forces with deeper pockets," said Matt Ortega, a former DNC staffer and Democratic digital consultant. "Howard Dean inspired this notion with his pioneering Internet operation that focused on 'people-power' as a concept. After his failed presidential bid, it was a philosophy that permeated the DNC while he was chair."

Much of Dean's web staff came out of technology, not politics. Republicans, without those ties, tend to rely more on political staffers who got into technology rather than technological experts who decided to get into politics. The right

has tried and failed to replicate the success of the left-wing online fundraising behemoth ActBlue.

"One problem facing the party is consultants who are okay or decent, but not the honest-to-God best in the business being given big, important contracts a little too routinely," said one Republican strategist. "I think the Republican effort did a pretty decent job of matching Obama's campaign in 2008, but the problem is that's not what they were competing against."

Rachel Weiner covers local politics for The Washington Post. 🐦 Follow @rachelweinerwp

**The Post Recommends**

## GOP-allied advocacy group American Action Network reports record fundraising

The robust fundraising shows how the nonprofit and its sister super PAC have cemented their roles as the dominant outside allies of the Republican House leaders.

## Trump's business booms as he runs for president, financial disclosures show

Spiking revenue coincides with the surging political fortunes of the real estate mogul.

## The states people really want to move to — and those they don't

A national trend has reversed.

E X H I B I T   11

You are not logged in. LOG IN NOW >

PDM HOME     PD+     *TECHPRESIDENT*     TELECONFERENCES     CONFERENCES     VIDEO     ABOUT

Search PDM


WEGOV


ONLINE ORGANIZING


BACKCHANNEL


CIVIC HACKING

# For Romney's Digital Campaign, a Second-Place Finish

BY NICK JUDD | Wednesday, November 7 2012

At every phase of the campaign, Mitt Romney's digital operation was half a step behind the technological savvy of Barack Obama's online team — at several moments, announcing features or ideas hours, days or months after the Obama campaign had already rolled them out.

After the primary election, Digital Director Zac Moffatt pointed out to me that the Romney campaign had not been operating with the breadth and depth of digital staff that Obama had at his disposal almost since day one. He argued at the time that digital communications were not in the budget for a Republican primary.

"Are those roles essential in a primary as you move from state to state?" he asked me, back in May.

In a September follow-up conversation, Moffatt described a digital operation that had been built up to comprise a core digital staff in Romney headquarters and a number of external vendors. The campaign used an external service, FLS Connect, to handle its phone banking by online volunteers. Another external service, Rally.org, handled Romney's online fundraising after it switched from a service, Fundly, that found its roots in Romney's 2007 Republican primary bid. The campaign passed a large amount of data into its own instance of Salesforce, a system used in business for tracking sales leads and other customer contacts. Meanwhile, Romney's opponents in Chicago largely hewed to a mix of systems built in-house this year mixed with systems built in-house in years previous. While outside vendors included Blue State Digital and NGP VAN, these companies were in essence extensions of the Democratic Party — NGP VAN thanks to a longstanding arrangement with the national committee and Blue State because its leadership is packed with veterans of the Howard Dean campaign and Obama's 2008 election effort.

Moffatt framed this choice as a mix of pragmatism in the face of a limited budget and a belief, he told me on various occasions, that the market had already surfaced the best tools for each job. The idea was to have the staff in-house for the general election to connect those services to one another.

"What we're doing," he said in May, "is having more talented people to glue this together."

As the campaign's digital operations ramped up, Moffatt's shop was beleaguered by a series of small losses. A campaign app misspelled "America" as "Amercia" — just the first of several times when the digital team's grasp of the English language would be called into question. The Obama campaign consistently released features or products ahead of the Romney team, whether that was beating Romney by a matter of hours in announcing a Square app for in-person fundraising early in the year to a matter of months in announcing a "Quick Donate" feature that allowed donors who had already given once to send a repeat donation.

Moffatt did advertise some digital successes. Romney's announcement that Paul Ryan would be his vice presidential nominee was supposed to come through a mobile application; while the campaign was beaten to the punch on the news, Moffatt says the announcement still drove two million unique visitors to the campaign's website, 40 percent of which came through mobile.

The digital operation was integrated with the rest of the Romney campaign, Moffatt told me in September.

As with other political campaigns this cycle, the Romney campaign maintained its own database of voters to attempt to find online. Using a data management platform, those voters were lumped into various audience segments the campaign attempted to track with advertising on the web —

something the campaign used both for persuasion and motivation, Moffatt told me.

"When an absentee ballot is dropping into a state, we have online ads that are chasing that, emails sent to the person, door knocks and phone calls, all coordinated into one holistic aligned digital slash political effort for turnout. There is no value in doing any of this online if you're not turning people out," he told me.

In experimenting with the Romney version of "Quick Donate," called "Victory Wallet," the campaign also found that people who had donated once were at least three times more likely to donate again — an example of how the campaign made adjustments over the course of the year to stay competitive. After the primary, Moffatt's operation shifted event management software in order to capture more information, like email addresses, from event attendees, collecting what he said were hundreds of thousands of new contacts.

And as the campaign drew to a close, the Romney campaign followed the Obama campaign in implementing a Facebook application — Romney's was called "Commit to Mitt" — that looked through users' Facebook friends to identify voters in swing states. Supporters could then message their friends and urge them to get out and vote. While the application never worked for me, according to stats listed on Facebook, it had 31,000 users.

The Obama campaign one-upped Team Romney here, as well: The Facebook friend-matching functionality came from a central Obama 2012 app, not a separate app. While both campaigns were able to send notifications to their users rather than rely on the news feed, where only a fraction of a Facebook page's audience actually sees a message unless the page owner pays a fee, Team Obama as a result could tug the sleeves of nearly one million Facebook users with a notification — a dramatically greater reach.

As the campaign wound down, Moffatt and his digital operation endured mounting criticism. Politico noted that the campaign had been outspent in online advertising and quoted Republican operatives as saying that Romney was leaving victories on the table for want of creativity. The Romney campaign was able to deploy all the same tools — website, mobile apps, social media like Twitter and Facebook and even a comparatively little-frequented Tumblr, a graphics and design department, and highly targeted online advertising — but was never able to point to an innovation that originated first in the Romney campaign and that yielded significant wins.

On election night, Yahoo's Dylan Stableford wrote that the Romney campaign — either in a final flourish of true class or a last digital embarrassment — had aired Obama's victory speech on its own website prior to running Romney's concession remarks.

The Romney campaign was every bit as interested in quantifying its successes or failures as Obama for America was, conducting surveys on panels of online ad-viewers to gauge the effectiveness of their ads, analyzing the results of fundraising asks and tweaking the subject lines that led their own barrages of email. As the Obama campaign celebrates, the defining conversation about the election's results will be the path to victory highlighted in Obama for America's data trail. The Romney campaign has its own statistics to analyze, even if the road through those numbers does not stop at the same destination.

---

RELATED TOPICS:  2012 PRESIDENTIAL ELECTION,  MITT ROMNEY,  ZAC MOFFATT          SHARE THIS

---

**1 Comment**      techpresident                                     Login ˅

♡ Recommend        ☟ Share                                          Sort by Best ˅

      Join the discussion...

   **elwood blues** · 4 years ago
             Good article as far as it goes. You need to mention Romney's ORCA project
             which is perhaps the biggest digital failure.
             5 ∧   ˅ · Reply · Share ›

**ALSO ON TECHPRESIDENT**

**With Quorum, See What (and Who) Makes Congress Tick**
1 comment • a year ago
🙂 Thinkbang — If one is looking for an affordable (if not as comprehensive) service other than Quorum, try the ...

**Civic Tech and Engagement: How and Why Nextdoor Brings ...**
4 comments • a year ago
 J. Davis — I learned way more from Todd's links than from Denise piece. nextdoor needs to be challenged. ...

E X H I B I T   12

# Trump campaign hires Hopewell's Scavino for social media

 John W. Barry, Poughkeepsie Journal    *4:32 p.m. EST February 12, 2016*

 Hopewell Junction resident Dan Scavino (/search/Scavino/), a longtime confidant of Donald Trump (/story/news/local/2016/01/19/trump-runs-dutchess-has-another-connection-presidential-race/78768006/), has been named director of social media for the real estate mogul's presidential campaign.

Scavino, who has known Trump (/search/trump/) for years, joined his campaign last year and has served as a senior adviser. Scavino has been working directly with the Republican presidential hopeful while managing his social media efforts.

*(Photo: Journal file)*

 THE POUGHKEEPSIE JOURNAL

As Trump runs, Dutchess has another connection to a presidential race (http://www.poughkeepsiejournal.com/story/news/local/2016/01/19/trump-runs-dutchess-has-another-connection-presidential-race/78768006/)

Trump (/videos/news/2016/01/19/79022176/) owns Trump National Golf Club, Hudson Valley (/story/news/local/southern-dutchess/2016/01/25/trumps-golf-club-wants-4-million-cut-tax-assessment/78768152/), in Stormville and Trump family members own property locally.

Scavino met Trump when he was a caddie and bag room attendant at Briarcliff Manor Club, which Trump later purchased and renamed Trump National Golf Club, Westchester. Scavino rose through the ranks to become the executive vice president and general manager at the golf club.

After a brief time working outside of the Trump organization, Scavino returned to work on this latest venture. Trump has more than 6 million followers on Twitter; more than 5 million "likes" on Facebook; and nearly 1 million followers on Instagram.

Read or Share this story: http://pojonews.co/1TfycVF

E X H I B I T   13

7/1/2016
Case 1:15-cr-00012-ABJ Document 27 Filed 07/13/16 Page 63 of 67
Donald Trump's campaign sued over text messages / Chicago Tribune

# Donald Trump's campaign sued over text messages



Donald Trump speaks during a campaign rally in Wilkes-Barre, Pa., on April 25, 2016. (Mel Evans / AP)

**By Grace Wong · Contact Reporter**
Chicago Tribune

APRIL 27, 2016, 5:55 AM

D onald Trump's principal campaign committee is being sued in a class-action complaint that says it sent unsolicited text messages.

Joshua Thorne filed the lawsuit Monday in the Eastern Division of the Northern District of Illinois against Donald J. Trump for President Inc. on behalf of anyone who has received the text messages.

The lawsuit alleges that the committee violated the Telephone Consumer Protection Act, which says it is illegal to send Short Message Services or text messages using an automatic telephone dialing system without the recipient's prior express consent. SMS messages and text messages often cost their recipients.

On or about March 4, 2015, Trump for President transmitted a message to Thorne's cellphone that said "Reply YES to subscribe to Donald J. Trump for President. Your subscription will help Make America Great Again!

Msg&data rates may apply," according to the lawsuit.

The source of the message was "88022," which is leased by Trump for President or its affiliates and is used for operating Trump for President's text message marketing program, according to the lawsuit. The same text messages were sent to thousands of wireless telephone numbers or randomly generated phone numbers using a bulk-messaging software by the company Tatango Inc., which advertises that a person can schedule a text message to be simultaneously sent to 42,435 cellphone numbers, the lawsuit said.

Tatango offers a free guide on compliance with the TCPA on its website, which says that without appropriate disclosures and prior written express consent, businesses could be fined up to $1,500 per text message received by each customer.

Thorne is asking for statutory damages to all class members; to stop the text messages to wireless phones through the use of an automatic telephone dialing system without prior express consent; reasonable attorneys' fees and costs; and any other relief the court deems reasonable and just.

"Based on the information we have at this point, we're very confident that a violation was made and we intend to pursue it to the gates of hell," said Joseph Siprut, managing partner of Siprut PC, which is representing the plaintiffs.

Representatives of Donald Trump for President Inc. could not be reached for comment.

*gwong@tribpub.com*

*Twitter @GraceWong630*

Copyright © 2016, Chicago Tribune

**This article is related to:** Donald Trump

**E X H I B I T   14**

> "Apple has told Republican leaders it will not provide funding or other support for the party's 2016 presidential convention, as it's done in the past, citing Donald Trump's controversial comments about women, immigrants and minorities."
>
> —Politico, June 18, 2016

...right. So doesn't that make you...

...AY, JULY 19, 2016

ONE DOLLAR CHEAP

# GOP CONVENTION FIGHTS TECHNOLOGY DEFICIT

### '"PC load letter"? What the [expletive] does that mean?'

By DAVID LIGHTMAN
CLEVELAND — When researchers at the Trump campaign needed to access a transcript from "Meet the Press," it took more than 15 minutes to open the site's home page. The slow connection, according to an IT technician at the Quicken Loans Arena, had to do with the network hardware—namely, a dial-up modem manufactured in 1996 by Lucent Technologies.

"It's not as bad as it sounds," said the technician, who asked to remain nameless. "All those pings, all that static—why, it's downright nostalgic. And besides, you'd be surprised how many bits per second you can get when the other telephone lines are quiet."

Because of the boycott by Apple and other technology firms, the Republican convention has had to get by with dial-up modems, roll-paper fax machines, and even dot-matrix printers. But campaign officials stressed the setback is minor. "Our message is the same," said Trump spokeswoman Hope Hicks. "It doesn't matter if that message is transmitted by FaceTime, Skype, or perforated, continuous fax paper. By the way, if anyone knows where to find ink cartridges for an Okidata Microline 320, I'd be grateful." Ms. Hicks was later seen berating an intern who printed a document in color.



Mike Miktus

Fortran experts run through the basics for GOP tech-support staff in Cleveland.

"Who needs these Apple losers, anyway?" asked Donald Trump during a press conference. "We've got amazing computer experts, incredible operators who have degrees in computers and who can operate Fortran and COBOL systems. They're just terrific." Mr. Trump then interrupted the press conference to take a call from his campaign manager, Paul Manafort. The presumptive nominee needed to exit the arena, however, in order to get better cell reception on his GTE flip-

Continued on Page A16

the weekly
## Standard
JULY 4 / JULY 11, 2016

Kevin Bertram
#44918-083
Federal Correctional
Complex Petersburg
PO Box 1000.
Petersburg, VA 23804



⇔44918-083⇔
Us District Court
333 Constitution AVE NW
Washington, DC 20001
United States

US District Court
333 Constitution Ave NW
Washington, DC   20001